FORT WORTH ELEVATOR CO. v. RUS-
SELL.

No. 12281.

Court of Civil Appeals of Texas. Forth Worth.
March 8, 1930.

Rehearing Denied April 12, 1930.

Cantey, Hanger & McMahon, of Fort Worth, for appellant.

. S. F. Houtchens and J. Harold Craik, both of Fort Worth, for appellee.

CONNER, C. J.

This suit was instituted by Mrs. Mary Lee Russell, for herself and as next friend of her five minor children, ranging in age from two and one-half months to twelve years, the plaintiffs being the widow and children of John T. Russell, who was killed while working for the defendant, Fort Worth Elevator Company, on March 20, 1925. The suit was for exemplary damages under article 8306, Rev. Statutes of 1925, based on gross negligence on the part of defendant alleged to have resulted in the death of John T. Russell.

The plaintiffs offered evidence to the effect that the defendant owned more than one plant, one of which is known as the "Katy" plant, located in the southern part of the city of Fort Worth, and at which the defendant placed one Pettyjohn as general superintendent with complete and full authority in operating the plant, the designation of employees to different tasks, etc. That Pettyjohn had a son-in-law named F. D. Walker who had been appointed as foreman, and one of his duties was the "spotting" of cars for loading and unloading at the elevator in question. That as such foreman he had authority to hire and discharge employees and generally direct the work indicated. It was alleged that Walker was very careless and reckless, of which complaint had been made to the general superintendent Pettyjohn more than once; that notwithstanding said complaints the defendant had kept Walker in its employ, giving him control over the men at work about the plant, and particularly in spotting cars.

The record discloses that in length the elevator plant extended in a general direction north and south; that on the west side thereof there were three tracks, numbered 1, 2, and 3. Track No. 1, the most westerly one, and track No. 2 were used for cars in which grain was to be loaded; track No. 3 extended along side the platform of the elevator and was used for unloading. The method used in the movement of the cars was by an electric motor situated at the south end of the elevator, at which one end of a chain or cable was attached, and the other end then extended and fastened to the loaded car, which it was designed to unload, then the operator of the motor applied its power and the car was drawn to the spot at which it was necessary to be in order to unload. On the car to be unloaded, an employee, designated as a "braky," was stationed, whose duty it was to apply the brakes in spotting the car. Another employee was stationed on the platform of the elevator, which was in the same horizontal plane as the floor of the car to be unloaded, his duty being to signal the brakeman and operator of the motor when the car was at the proper spot. The deceased Russell was alleged to have been assisting in the moving of some cars at and just prior to the time of his death. On the occasion in question he, under the direction of Walker, went in between two box cars to fix the coupling of said cars or arrange them so that, when said cars came together, said couplings would not catch; that Walker, without any notice or warning whatever to Russell, and without being signaled to do so, very negligently and carelessly set said electric motor in motion by turning on the electric current, which suddenly moved the box car to which said cable was attached against said box car immediately in front of the same, so quickly as to catch Russell between the cars, and crushed, mashed, and mangled his body so severely that he died from the effects thereof.

It was alleged that Walker was grossly negligent in thus applying the power, and that Pettyjohn, the general superintendent, was grossly negligent in retaining Walker in the employment of the company and under his direction with full knowledge of Walker's reckless and negligent character, and that such negligence was imputable to the defendant company.

The defendant pleaded demurrers, a general denial, and that Russell was guilty of contributory negligence (a) in going between the cars on the occasion in question and placing himself in danger or peril; (b) in not stepping in the clear of said cars after he had gone between the cars; and (c) in not keeping a proper lookout for his own safety. Defendant also pleaded that the dangers connected with the work of its plant were open and apparent and known to the deceased, and that he assumed every risk incident to his employment.

The case was submitted to a jury on special issues, the charge of the court and the answers of the jury to said issues being as follows:
"Gentlemen:

"This case is submitted to you on special issues, each of which you will answer only by unanimous consent. To aid you, I give you the following definitions:

"Gross negligence consists of such an entire want of care as raises the belief that the acts complained of were the result of a conscious indifference to the rights or welfare of the person affected by it.

"Exemplary damages are those which are awarded in addition to actual damages and may be allowed where acts complained of are wantonly or maliciously done with intent to injure the complaining party or with a reckless disregard of the injurious consequences of his acts to others.

"Actual damages are damages awarded to compensate for the pecuniary loss sustained,

while exemplary damages are punitive in their nature.

"Bearing in mind these instructions, please answer:

"1. Was Walker guilty of gross negligence in turning on at the time and under the circumstances that he did, the power that pulled together the cars that killed Shorty Russell? Answer: Yes.

"2. If you have answered No. 1 'no,' you need not answer any further questions, but if you have answered it 'yes,' then answer: Did Walker at the time Russell was hurt in March, 1925, have authority to control in his own discretion the matter of spotting the cars that killed Shorty Russell, including the authority to control within his own judgment the work of the other men engaged in spotting such cars? Answer: Yes.

"3. Prior to and up to the time Russell was hurt, was Walker of a reckless and careless disposition in his work at defendant's plant? Answer: Yes.

"4. If you have answered No. 3 'no,' do not answer No. 4, but if you have answered it 'yes,' then answer: Did Pettyjohn know of such disposition of Walker prior to the time that Russell was hurt in March, 1925? Answer: Yes.

"5. If you have answered No. 4 'no,' you need not answer No. 5, but if you have answered it 'yes,' then answer: Was Pettyjohn guilty of gross negligence in having Walker in defendant's employ at the time Shorty Russell was hurt in March, 1925? Answer: Yes.

"6. What sum, if any, if paid now in cash do you fix as exemplary damages, as defined above? Answer: $25,000.00.

"In making your answer to this question, you will not allow any sum for actual damages; the actual damages are not involved in this suit. Neither party would be allowed to offer any proof to you of actual damages or whether they have been paid, if any such exist or not.

"The burden of proof is upon the plaintiff to establish by a preponderance of the evidence the following answers: 'Yes' to Nos. 1, 2, 3, 4 and 5, and the answer, if any, to No. 6, but in making your answers you may consider all of the evidence adduced in this cause.

"You are the exclusive judges of the credibility of the witnesses and of the weight to be given their testimony, but you receive the law from the court as the same has been given to you in this trial, and will be governed thereby. In making your answers, confine yourselves wholly to the evidence in this cause and refrain from discussing or considering your personal observations or experiences had outside of this trial."

Upon the verdict so rendered, the court entered judgment for the plaintiffs in the sum of $25,000, which was later reduced by a remittitur of $15,000, which was apportioned by the court among the plaintiffs. To the judgment so entered, the defendant excepted and has duly appealed to this court.

Appellant presents 46 propositions urging error in the proceedings below. Those propositions which present questions that we deem to be material and necessary to be discussed, may be summarized thus:

(1) Did the court commit error in refusing defendant's requested peremptory instruction to find for the defendant on the ground that the evidence was insufficient to show gross negligence on the part of either Pettyjohn, the general superintendent, or Walker, the dock foreman, as he is termed in the evidence?

(2) Did the court err in refusing to submit to the jury defendant's requested special issues which sought findings as to whether or not the deceased Russell was guilty of contributory negligence, or assumed the risk of negligence on the part of Walker, a fellow servant, as defendant alleged?

Other questions not thought to be of controlling effect will be briefly noted incidentally and later.

This action is based upon section 5, of article 8306 of the Workmen's Compensation Law (Rev. St. 1925), which reads as follows: "Nothing in this law shall be taken or held to prohibit the recovery of exemplary damages by the surviving husband, wife, heirs of his or her body, or such of them as there may be of any deceased employee whose death is occasioned by homicide from the wilful act or omission or gross negligence of any person, firm or corporation from the employer of such employee at the time of the injury causing the death of the latter. In any suit so brought for exemplary damages the trial shall be de novo, and no presumption shall exist that any award, ruling or finding of the Industrial Accident Board was correct. In any such suit, such award, ruling or finding shall neither be pleaded nor offered in evidence."

The validity and binding force of the section quoted is not questioned by appellant. Exception is taken, however, to the court's definition of the term "gross negligence," and it is insisted that neither the general superintendent Pettyjohn nor the dock foreman Walker was so related to the defendant as that the negligence of either, if any, should be held to be the negligence of the defendant itself, and that therefore the court should have peremptorily instructed the jury to find in favor of the defendant as was requested.

We find no error in the court's definition of the term "gross negligence." The definition given is substantially in the same language as used by Chief Justice Stayton in Mo. Pac. Ry. Co. v. Shuford, 72 Tex. 165, 10 S. W. 408, 411, which reads as follows: "Gross negligence, to be the ground for exemplary damages, should

be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it."

We find numerous definitions of the term in Words and Phrases, Second Series, Vol. 2, page 789 et seq. For instance, in Thomason v. So. Ry. Co., 72 S. C. 1, 51 S. E. 443, it is said that "gross negligence" is sometimes defined as the entire absence of care. In Moss v. Home Ins. Co. of New York (Ky.) 99 S. W. 308, 309, it is said that "gross negligence * * * is the failure to use that degree of care that careless and inattentive persons would usually exercise under the circumstances as then and there existed." See, also, Southern Cotton Press & Mfg. Co. v. Bradley, 52 Tex. 587; I. & G. N. Ry. Co. v. Cocke, 64 Tex. 151; Mo. Pac. Ry. Co. v. Shuford, 72 Tex. 165, 10 S. W. 408; Dallas City Ry. Co. v. Beeman, 74 Tex. 291, 11 S. W. 1102; Robertson v. Magnolia Petroleum Co. (Tex. Civ. App.) 255 S. W. 223.

■■ While in some respects the evidence and its reasonable implications is conflicting, yet we think it amply sufficient to sustain the jury's finding and judgment that both Pettyjohn and Walker were guilty of gross negligence. So far as necessary, we quote the following:

The witness, Thomas, who was working for the defendant at the time of the accident testified in part as follows:

"I was supposed to have been there to handle that controller at the time, but I wasn't on duty at that time. I wasn't on the controller. At that time I was on the opposite side of the building. At that time I was either painting the bathroom door, or sinking a post for the bathroom door to open back against. Mr. F. D. Walker, the track foreman, directed me to go to work on that. It was some time in the forenoon that Mr. Walker told me to go over to this other place and do the painting."

Said witness further testified:

"I knew F. D. Walker. He was what we would call dock foreman. Told the men what to do in unloading and loading and breaking into a car, and such as that. We call it general dock foreman. First when we would spot a car, F. D. Walker would come and O. K. the car, open it up, tell the boys to open up. If any of the boys was out of place, he hired a man and put in his place, or if any man failed to do so, he would discharge him and put someone in his place. That is why we called him foreman, because he had authority to hire and fire. I know of men he had fired and men he had hired. I don't know as I can call all the names, but Ben Harris is one, and Sleepy Moore, we called him, I don't know his initials, Cecil Lusk is three. The others I don't believe I can call to mind just now, but there are others.

"F. D. Walker gave the directions out there as to what to do on the loading dock. As well as I can remember, he had been giving us such instructions, something like two or four months before the accident, perhaps, or maybe longer than that, maybe six or eight months. I never paid much attention to the length of time he was there. Outside of this Mr. Pettyjohn directed the other men out there as to what to do. Mr. Walker had full charge of all men on the loading dock. I know who told the other men about the loading dock, what to do and when to do it. It was Mr. F. D. Walker."

The witness Harkey, who was present at the time of the accident, testified in part as follows:

"At the actual time when the accident occurred, when Mr. Russell was hurt, I was right near the controller—the car mover controller. Mr. F. D. Walker was handling the motor at that time. I was something like four or five feet from Mr. Walker at the time. It should take about three persons to spot the cars. Mr. Walker was operating the car mover, and Ben Harris was acting as brakeman and I don't know who was spotting the car on the platform. I don't know who was on that side. Mr. Russell was helping in that particular act at the time of this accident. He helped pull the cable out to hook on the car that was moved, and then he was doing other things as he was called on to do. Mr. Walker would call on him to do it.

"Mr. Russell was between the cars when the accident happened. I know how he came to go there. I was where I could actually see what was going on and hear what was said. Mr. Walker told him to go between the cars. He told him to go between the cars and close the nipple so they wouldn't couple when the cars went together, when they were pulled against each other. He did that. While he was in between the cars, Walker pulled the cars together and caught Mr. Russell between the cars.

"The first thing I saw that happened after that was when Mr. Russell fell from between the cars, fell out to one side. He fell out on the right side, with his head down. He was facing then south. The controller, Mr. Walker, and I, were south from where Mr. Russell was when he fell out. It was about the distance of two car lengths, maybe a little more.

"I called Mr. Russell 'Shorty.' At the time Mr. Walker called to Mr. Russell to go between the cars and fix the knuckles so they wouldn't link, Mr. Russell was about two car lengths north of where we were at, right at the end of the cars, and at the time I was something like three or four feet from Mr. Walker, when he made that remark. At that particular time, Ben Harris was on top of the third car back. I don't know how far the car that was to be moved was from the car in front, about two or three feet.

"That was the general custom in moving the cars, to fix the knuckles so they wouldn't make. It was the custom to close the knuckles so the cars that were to go by the spot would roll on, so as to not pull the one that was to be spotted on beyond its destination, and the man on top called brakey, on the top of the car that was to be spotted, was to control the brake on the car to be spotted."

Said witness further testified:

"When the accident happened, and Mr. Russell fell out, I went to him. Mr. Walker and Ben Harris also went to him. Mr. Walker asked Mr. Russell, he said 'Shorty, are you hurt?' Mr. Russell said 'Yes, Walker, I am killed,' and Mr. Russell said 'Why did you pull the cars on me? Why did you start the motor?' Something to that effect, and Mr. Walker said, 'I don't know why I did it.' We took Mr. Russell up and laid him up on the loading dock platform while waiting for the ambulance. I did not see Mr. Russell after that time, after he was taken away."

Said witness further testified as follows:

"In spotting those cars it is necessary that the cars do not couple. If that coupling is open, that automatic feature there would couple the cars together, and we had some difficulty in spotting more than one car at a time."

Said witness further testified in part as follows:

"I know what position Mr. Walker held at that particular time. He was general foreman of the plant, of the spotting work and such as that. Mr. Walker's duties was to take care of the unloading and loading grain, see that all cars were unloaded and loaded, and records kept of the car numbers and such as that, and see that the work was properly done. I know whether he ever employed any of the men or not. I know whether he ever fired any of the men or not. He did it.

"Mr. Walker directed these men what to do. The men followed his instructions. I don't remember ever talking to Mr. Pettijohn about what relationship Mr. Walker bore to the spotting of the cars out there. I had a conversation with him about the relationship I was to bear to Walker. I was to do as he instructed. That was my instructions from Pettijohn."

Said witness further testified in part as follows:

"It was just almost an instant after Mr. Russell went in between the cars before Mr. Walker turned the power on. Mr. Walker said something at the time he turned the power on. He said 'I believe I got Shorty.'

"Mr. Walker hollered, 'Go in and fix the coupling' before Mr. Russell hollered 'Wait a minute.' About the accidents that I told that Mr. Walker had had, I knew of him starting the machinery that unloads the cars, that operates the grain shoves.

"There are four controller boxes all right together, all on the same post, and I knew of him going to the controller post to start the machines and start the wrong ones a number of times, and I have known of him starting one conveyor belt and run the grain out to another one that wasn't running, run the grain on the floor instead of in the conveyor. I have known of him opening the bins without starting the conveyor belt.

"If the conveyor belt was not running so it would take the grain away, it would run all over the floor. I have known of him starting the car puller before they would be ready for that and jerking the cable away from the men. As they would go to hook it on the car, he would start the car mover. He would start the controller before they got it fully hooked, and I have known of him in operating the car mover, he would operate the car mover on the wrong track.

"All of these matters I am relating occurred prior to the accident. He was back in the tunnel and the conveyor belt was running and no grain on it, and he stepped on the conveyor belt, and that is the nearest I ever knew of anyone else being hurt, was himself. As for other little minor things, I don't know that I could call all of them to mind right now."

Witness Harris testified in part as follows:

"We had a string of cars, as much as five or six cars and pulled down until the one I was riding was under the north edge of the shed, and Mr. Walker—it was the custom to cut the cars off, that is, cut the cars free to keep from pulling the brakey off the spot. It is very hard to hold an empty car with some loads in front of your drag. You cut those cars off in front. Mr. Walker told Russell to cut the cars off and fix the knuckles so they wouldn't close, that is, close the knuckles so they wouldn't close and pull him off the spot.

"At the time Mr. Walker told Russell that, the car I was on, and the ones to the south were stopped. It was just a short space between the car I was on and the one in front, when Shorty went to go in there and he was supposed to do what he said do. He went in immediately after Mr. Walker told him to go in there.

"While Russell was in there, he got bumped with the cars, pinched between two cars and fell out backward over the cable."

He further testified in part as follows:

"I asked him if he was hurt. He said he was, thought he would die, he was bad hurt. Mr. Walker came back while I was there. He asked Shorty if he was hurt and Shorty told him he was hurt, hurt bad, and he said 'Walker, why did you start the motor

while I was in there?' Walker said 'I don't know, Shorty.'"

Said witness further testified:

"Mr. Walker had been working out there in the capacity I have outlined, from the time of its construction to the time of the accident. Mr. Walker's position there was that of foreman. Walker was track foreman. His duties were to tell us boys what to do and when to do it. Walker had been track foreman ever since the plant opened up, until that time.

"I do know whether or not he ever. hired any of the persons that worked there on that particular job. I do know whether he ever fired any of the men that had been working on that particular job. He did. He hired and fired both."

The witness W. B. Robertson testified in part as follows:

"This man is the track foreman. In March, 1925, F. D. Walker was track foreman out there. As to how long he has been foreman out there, he was foreman when I went out there and I went there six days after the place opened up for operation.

"I took my reports from F. D. Walker, track foreman at that time."

The witness Walker, himself, testified in part as follows:

"I went out in the yards and took these cars numbers and then went into the office and they gave me the destination on each particular car, which scale it went up and what bin it was going to, on each car of stuff. Then I handled the levers, and told the boys which cars to open up, which cars to run by, if we should run one by, to unload at the time, because I had the dope on the books."

The witness W. L. Adams, traffic manager and timekeeper for the defendant, testified in part as follows:

"I cannot remember just how long he had charge of the unloading. I think he had charge of the unloading from the time the elevator started, of the unloading until some little time after the Russell accident happened."

The witness Ingraham, vice president and treasurer of the defendant, testified in part as follows:

"Mr. Pettijohn, of course, he was put out there and whatever he did out there in the employment and placing men in various positions, I presume that was within his authority. In reference to whether I knew that among the duties delegated to Mr. F. D. Walker, that he was to see that cars were to be unloaded, were to be spotted at certain places to be unloaded, I will say that I didn't know what his particular duties were out there. He would have to do whatever Mr. Pettijohn told him to do, as far as I know, and as far as I was concerned that was agree-

able to me. I knew that F. D. Walker was the son-in-law of Mr. Pettijohn."

The witness Jule G. Smith, president of the defendant corporation, testified as follows:

"I say that Mr. Pettijohn was placed out there as superintendent, and he had authority from me to employ and discharge men. I delegated that duty to him as an official of the corporation as an employee of the corporation, superintendent out there. Whatever he did out there he was acting within his own judgment in the discharge of his duties as superintendent.

"I left it up to his judgment as to the kind of men he employed and the kind of men he kept in his employment largely, with the single exceptions I made here, that I recommended two or three or several. With reference to whether I talked to Mr. Pettijohn about Mr. Walker, I will say that I talked to him about many men out there."

He further testified in part as follows:

"I left it up to him entirely if he wanted to choose one man as foreman out on the works and things like that, that was a matter I left with him."

He further testified:

"I found Walker, as I recall now, sitting on some sacks down in the basement one day asleep, but his calling me Mr. Schultz, I am pretty sure that is a fairy tale. He was sitting down on some sacks nodding, sleeping when I found him. I don't recall whether I woke him up or not. It was rather an amusing incident. He woke up."

Said president of the defendant testified further as follows:

"I relied upon Mr. Pettijohn's judgment in the matter of everything pertaining to the elevator, even to the construction of the same, and I relied on my own judgment. As far as wages he paid the man, I had perfect confidence in his protecting the interests of our concern there and left those matters wholly to him.

"If he wanted to designate his son-in-law Walker as foreman down there, that was his pleasure, that would have been perfectly satisfactory to me.

"I have no idea who has Mr. Walker's place out there at the present time. He had so many places. I think he did everything from sweep up man to almost superintendent at times. He has done everything, all the way up to superintendent at times, practically so. As to whether I knew that all the time, I related my source of information regarding Walker's duties out there twice this morning on the stand that I got from Mr. Pettijohn."

The witness Jule B. Smith, assistant secretary and treasurer of the defendant corporation, testified in part as follows:

"I know Mr. Pettijohn. He was put out there in charge of the plant. The corporation put him out there, as general superintendent and gave him authority to employ and discharge employees. And left it up to his judgment as to who he wanted to employ and who he wanted to discharge; left it up to him if he had a careless man on the job, if he wanted to keep him, or the company left it up to him to keep him on if he wanted to, he was in general charge of hiring and firing employees."

Said witness further testified:

"If the superintendent left it to the foreman on the job as to whether or not to discharge a man, that was all right, we left it up to Pettijohn's judgment. He was supposed to attend to all that as I understand it."

The witness George Ingraham, assistant secretary and treasurer, testified in part as follows:

"I say that I made no investigation or inquiry to find out whether or not Walker was a careful man or not. I presume it was the superintendent's duty to see if employees were careful, the men he employed. That was left entirely up to the superintendent. He did the employing of his men. And whatever the superintendent did was all right with the officials of the company, I suppose. And if the superintendent wanted to employ a man that was careless and negligent, I left that up to the judgment of the superintendent."

The witness D. K. Sterrett, the superintendent of the defendant corporation, testified, in part as follows with reference to whether or not Walker was careless and reckless:

"I have heard the boys talking among themselves that he was kind of odd and reckless. I don't know that I ever heard them say he was careless.

"I have heard them say he was reckless. I don't know whether that remark was made a good many times or not. I will tell you— to be honest with you, I didn't hear as much gossip as the rest of the boys did. I did hear something along the line of what I have just testified to. That is just about what it was. I cannot repeat the exact words that they said."

Said witness further testified with reference to the duties of Mr. Race, who took Mr. Walker's place as follows:

"It is the duty of the men to obey him. He would be considered the foreman of that particular work in some sense of the word."

Witness McMinn testified in part as follows:

Russell was picked up and carried and put on the dock. I was with him during that time. If Russell ever made the statement there to anybody that Walker wasn't to blame for it I never heard it. I never heard him say anything. I never heard anything there. The only sound at all I heard, I heard him say 'Oh, Lord' and 'Oh, My God' and such as that, is all I heard him say. Shorty's general reputation out there at that plant for being a careful workman was all right as far as I know.

"I have heard Walker's reputation discussed out there among the employees, as to being reckless and careless. The work Mr. Walker was doing out there was foreman out on the track. He was in charge of the boys doing the unloading. I did not take any orders from Walker that I remember. I worked on the inside."

In Rhmyes v. Jackson Elec. Ry., Light & Power Co., 85 Miss. 140, 37 So. 708, it was held that, where a motorman allowed his car to run down a sharp grade past a number of persons engaged in picking up packages on the edge of the track, at the place of a recent accident, with no control of the car and without sounding an alarm, he was guilty of gross negligence, justifying a verdict for injuries to one of the persons so engaged, though the latter may be guilty of contributory negligence.

In the case of Renaud v. N. Y., etc., Ry. Co., 210 Mass. 553, 97 N. E. 98, 38 L. R. A. (N. S.) 689, it was held that a failure on the part of a locomotive engineer to see when he ought to have seen, and when the consequences of such failure might result in the death of a human being, may be found to be gross negligence, within the statute rendering a carrier liable for the death of a passenger resulting from the gross negligence of its employees.

So that, as already indicated, we think under the evidence we must unquestionably overrule appellant's assignments that the evidence is such that the court should have given a peremptory instruction, or even was required to set aside the verdict as unsustained.

It is further insisted, however, that to authorize the recovery sought it should have been shown that the gross negligence was committed by some superior officer or officers having control of the corporation itself instead of either Pettyjohn or Walker, who were mere employees. This contention seems to be directly answered by the case of Chronister Lumber Co. v. Williams, 116 Tex. 207, 288 S. W. 402, 404, by the Commission of Appeals and approved by the Supreme Court. We quote the following from that case:

"The Chronister Lumber Company, in the achievement of its corporate purpose, maintained and operated a tram railroad for the transportation of timber and its employees. The maintenance and operation of this facility was an important and substantial element of its plant. To supply timber for

its sawmill (another important and essential plant element), it maintained a 'woods force' of employees, and, as stated, used the railroad for transportation between forest and mill. In charge of the 'woods force' and the transportation operations it had a 'woods foreman,' Harris Anderson. His duty and authority embraced superintendence of the logging and hauling operations, specifically the make-up, speed, and other details of operation of the train. 'It was the trainmen's duty to comply with his orders.' The corporation itself, as owner and user of the railroad, was charged with knowledge of the proper consist and arrangement, speed, etc., of the trains, and with the duty of correct application of that knowledge. This duty it delegated to the 'woods foreman,' without instructions, so far as we are advised, as to how the duty should be performed. It left to him the authority to place the caboose, in which the men were to ride, at the front instead of at the rear of the train, if he should so desire, and the power to control the speed, etc., of the train as thus made up. His authority in the premises was superior to that of the train operatives and of the employees who were to ride on the train. The train as arranged, and its operation as arranged, under Harris' 'superintendence' was the train and the operation of the corporation itself, for all this was 'previously authorized.' If Harris was negligent in any of these respects, his negligence, whatever its degree, was that of the corporation. Such is the inevitable result of applying the principles stated to the facts certified."

The conclusion reached was that a corporation, as an artificial being, can act only through the agency of men and women, and that the test of liability in such cases is whether the particular act of an employee complained of was within the scope of his authority. If so, his act is to be considered the act of the corporation. See, also, on this point, People's Ice Co. v. Nowling, 16 S. W.(2d) 976, by the Amarillo Court of Civil Appeals; and Cicero-Smith Lumber Co. v. Denton, 16 S.W.(2d) 932, by the Amarillo Court of Civil Appeals, where it was held that the act of the manager of a lumber company in making a false affidavit of attachment was within the scope of his employment, and that the corporation was liable in exemplary damages if the attachment was issued without probable cause or maliciously.

In Quinn v. Glenn Lumber Co., 103 Tex. 253, 126 S. W. 2, it was held by our Supreme Court, in an opinion by Judge Williams, that it was the duty of a foreman in a sawmill to keep the machinery in a proper condition, and that he represented the master in the performance of a nondelegable duty, and that he was not a fellow servant of the sawyer.

But appellant insists that, because of the deceased's contributory negligence, knowledge of the danger, etc., the court should have given the peremptory instruction, or at least have submitted the issues requested relating to contributory negligence, assumed risk, etc.

In the case of Magnolia Petroleum Co. v. Ford, 14 S.W.(2d) 97, 98, the Eastland Court of Civil Appeals expressly held that the common-law defense of contributory negligence and assumption of risk in an action for the death of an employee to recover exemplary damages for gross negligence was abrogated by the Workmen's Compensation Law.

Section 1 of article 8306, and subsections 1, 2, and 3, Rev. St. 1925, read as follows:

"Sec. 1. In an action to recover damages for personal injuries sustained by an employee in the course of his employment, or for death resulting from personal injury so sustained, it shall not be a defense:

"1. That the employee was guilty of contributory negligence.

"2. That the injury was caused by the negligence of a fellow employee.

"3. That the employee had assumed the risk of the injury incident to his employment; but such employer may defend in such action on the ground that the injury was caused by the willful intention of the employee to bring about the injury, or was so caused while the employee was in a state of intoxication."

Judge Funderburk, who wrote the opinion in that case, calls attention to the fact that the Workmen's Compensation Law passed in 1913 in its original form contains sections corresponding to 1 and 5 of the present law; that section 1 then, as now, abolished the defenses of assumed risk, contributory negligence, etc., and that section 5, which we quoted in the beginning, reads as now, except that as originally enacted it provided that, "in all cases where exemplary damages are sought under this section [i. e. section 5], in case the injured party has already been awarded actual damages by the board herein provided, said fact and said amount so received shall be made known to the court or jury trying said cause for exemplary damages; and on the issue for exemplary damages he shall have the same defenses as under the existing law." See section 5, pt. 1, c. 179, p. 429, Acts 1913.

It was reasoned that, inasmuch as by the codification section 5 was so amended as to omit the provision that in cases under section 5 the defendant was entitled to the same defenses that existed generally, the legislative intent was manifested that the inhibition contained in article 8306 should be operative to exclude the defenses under consideration in actions brought under section 5 as it now reads.

A writ of error was granted in that case, but affirmed on the ground that there was no gross negligence on the part of the Magnolia Petroleum Company. The Supreme Court took occasion to say, however, that "the conclusion of the Court of Civil Appeals that the common-law defenses of contributory negligence and assumed risk are not available in a suit for exemplary damages permitted by the Workmen's Compensation Act * * * is not before us for consideration, and no opinion is expressed as to the soundness of that conclusion." See 17 S.W.(2d) 36.

While, as shown, the Supreme Court declined to consider the question, we feel that on principle the decision of the Eastland court is correct, and that, in cases for exemplary damages under section 5 for injuries inflicted by means of gross negligence, the defenses of assumed risk and contributory negligence are not available. In McCue v. Klein, 60 Tex. 168, 48 Am. Rep. 260, our Supreme Court held that the consent of one whose death was caused by drinking three pints of whisky on a wager was no defense to the person who knowingly gave the liquor. In Shumacker v. St. Louis & S. F. Ry. Co. (C. C.) 39 F. 174, it was held that the highest duty of man is to protect human life, or the person of a human being. That duty is never performed so as to escape responsibility until the greatest care, under the circumstances, has been exercised; and the fact that one has carelessly put himself in the place of danger is never an excuse for another purposely or recklessly injuring him. All our decisions preclude these defenses in the ordinary case for damages where there is discovered peril, even though the negligence shown is only a want of ordinary care not involving malice, or recklessness, and when the damages are only compensatory. See, also, Rhymes v. Jackson Elec. Ry., etc., Co., 85 Miss. 140, 37 So. 708, from which we have hereinbefore quoted.

This case under the evidence would seem to fall within the class of examples given in the Penal Code of negligent homicide. See Pen. Code, art. 1234, and we have been unable to find a decision or text-writer, and appellant has cited us none, that supports the contention that the defense of assumed risk, contributory negligence, or the negligence of a coemployee is available in the defense of one guilty of a negligent homicide. As a matter of public policy, manifestly, for the protection of human life, the defense mentioned ought not to excuse one who in utter disregard of the dangerous situation of another starts a death-dealing agency, knowingly and without lawful excuse or necessity which results in the death of another, even though such other person has knowingly or negligently placed himself in a dangerous position.

All assignments and propositions involving the questions just discussed are accordingly overruled.

Nothing else of vital importance now occurs to us. We think no reversible error was committed by the court in overruling the demurrers presented. The pleadings of appellee seem to be substantially sufficient to authorize the submission of the evidence that we have quoted and to support the verdict and judgment. The facts as we view them do not raise the issue of proximate cause. It is evident that the immediate and proximate cause of Russell's death was the gross negligence of Walker in applying the power, and it has more than once been decided that, where the evidence fails to raise the issue, it would be error to submit it. G. C. & S. F. Ry. Co. v. Rowland, 90 Tex. 365, 38 S. W. 756; St. L. S. W. Ry. Co. v. Missildine (Tex. Civ. App.) 157 S. W. 245; Wichita Valley Ry. Co. v. Williams (Tex. Civ. App.) 3 S.W.(2d) 141; M., K. & T. Ry. Co. v. Cheek (Tex. Civ. App.) 18 S.W.(2d) 804; Magnolia Petroleum Co. v. Ford (Tex. Civ. App.) 14 S.W.(2d) 97.

We fail to find any prejudicial error in the action of the court in making the apportionment of the damages, after the remittitur had been entered among those entitled thereto. Appellees have made no complaint; and we fail to find any reasonable ground of complaint in this respect on appellant's part.

We conclude that all assignments and propositions of error should be overruled, and the judgment affirmed.